No. 30,943.

L. R. KERSHAW, Receiver of the Montgomery County National Bank, *Appellant*, v. ROY COZAD, *Appellee*.

(19 P. 2d 452.)

Opinion filed March 11, 1933.

*Sullivan Lomax*, of Cherryvale, for the appellant.
*C. W. Mitchell*, of Cherryvale, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by the receiver of a failed bank to recover on a promissory note given to the bank before it closed. The defense was that the note was given for the bank's accommodation. Defendant assumed the burden of proof. At the close of defendant's evidence plaintiff demurred. The demurrer was overruled. The re-

ceiver then stood on defendant's evidence, and the court directed a verdict for defendant. The receiver appeals. The question is whether the note was given for accommodation of the bank, or for accommodation of some of the directors of the bank.

The bank was a national bank. Stockholders had been assessed on their stock. Some of the stockholders did not pay the assessment, but "turned in" their stock—"threw it on the table"—as counsel for defendant expresses it. The giving of plaintiff's note followed, and the effect of turning in the stock may be discussed before examining the testimony bearing on the subject of accommodation paper.

The order of the comptroller of the currency levying the assessment fixed the liability of the stockholders, and the liability was an asset of the bank. The bank could not assume that liability, and was prohibited from acquiring or holding the stock, except under circumstances not material here. Therefore, so far as the relation of the bank to the stockholders was concerned, throwing the stock on the table was just as futile as throwing it under the table. The stockholders could not effect discharge of their liability by any attempted surrender of stock, and the bank could not accept the gesture as satisfaction of the liability. Of course the bank needed money, or the assessment would not have been made; but the bank could not borrow money or credit to meet the assessment. The stockholders, or some persons for the stockholders, were obliged to provide the money or credit.

Some of the directors undertook to borrow money to pay the delinquent assessment, and the effort in that direction resulted in defendant giving his note to the bank as payee. W. L. Dillman was president of the bank, and conducted the negotiations with defendant. Dillman testified as follows:

"The conversation I had with him took place at his filling station on West Main street. I went to him and told him that some of the directors of the bank needed some money to pay an assessment on some stock that had been turned in, and asked him if he would loan some money he had on deposit there, about $2,200. He stated he had a check out for this money; that he had some investments, and that if he had known it a day or so sooner he would have let us use it. I told him if he would give us his note for it we could still make the deal, and he did so.

"Q. Was there anything said in this conversation which you have referred to in regard to him having to pay this note or not having to pay it, that you recall? A. No, it was to be paid by the directors, who gave him a note for like amount, as well as the interest.

"Q. In fact, it was understood in that conversation that he was not to be called upon to pay this note that he signed, is that right? A. That was the understanding.

"I told him if he would give his note it would answer for the same purpose as the cash. That is, the directors would give him their notes, and his note would be given to the bank. I think he understood that. His note was then turned into the bank as so much cash.

"Certain directors of the bank signed a note for a like amount to Mr. Cozad at the time he signed the note in question in this case. The note signed to Cozad was executed by Dillman, L. F. Carson, L. C. Wilkes and Fred Gasser, all directors of the bank. There were six directors of the bank at that time; two of them refused to sign this note.

"I held the note which had been signed to him by the directors. I do not know whether he ever did have it, and it may be at the bank yet. I was holding it just like I would hold any other collection that anybody had given me to collect. The bank had no interest in it.

"I . . . showed it to Cozad, Cozad saying that when everything was paid on it or interest was credited on it, 'you will have it there.'

"Q. You stated awhile ago you went to Mr. Cozad and told him that certain directors of the bank wanted to borrow money from him to pay their assessment, is that right? A. No, to pay assessment on some stock that had been turned in.

"Q. Then this note was to pay an assessment on the stock that had been turned in, you mean that had been surrendered to the bank? A. Yes, sir."

Defendant testified concerning the conversation with Dillman as follows:

"He said he wanted to borrow some money, and I told him I did not have any money. He suggested that I had a deposit at the bank, and I told him I had a check out against that to take it all up. He said, well, we don't need the money. If you can give us your note, you won't ever have to pay it or pay the interest on it.

"I signed the note because I knew all the directors, and they had accommodated me when I didn't have any money. I would write a check for my stuff, and they would take care of it. They helped me out in many a pinch. I just thought I would return the accommodation to them.

"I knew the directors of the bank, and they had always been accommodating to me. I wanted to do what I could to help them and the bank out. Mr. Dillman told me they had an assessment on some stock at the bank. He did not tell me what stock it was or who owned it.

"Q. Now, to refresh your recollection, I will ask you if Mr. Dillman did not tell you that the directors of the bank wished to borrow some money; were not those his words? A. Yes, sir; he said they wanted to borrow money to pay this assessment on the stock."

With this testimony before it, the court was not authorized to render judgment for defendant. Some of the directors wanted to

borrow money to pay the assessment on the stock which had been turned in. Defendant could not lend money, but his note could be used in place of cash to make the deal. Defendant gave his note, which was turned to the bank in place of cash. The directors gave defendant their note. The bank had no interest in that note. This is a plain case, and a common case, of individual directors undertaking to make good to the bank the default of assessed stockholders, and there is no basis in the evidence which has been printed for any other conclusion. In such cases the question always is, To whom did the accommodating party in fact lend his credit? When the credit is in fact loaned to a third person to accomplish his purpose, it is not material that the note is given directly to the bank, or that the bank is indirectly benefited. This was made clear in the opinion in the case of *Bank v. Watson,* 99 Kan. 686, 688, 163 Pac. 637, where the distinction between the legal and popular conceptions of "accommodation" was pointed out.

The important question is whether plaintiff's demurrer to defendant's evidence should have been sustained.

Defendant testified he wanted to accommodate the directors. Then he testified he wanted to help the directors and the bank. Then he testified as follows:

"Q. And you told him that you would like to accommodate them (the directors) if you could? A. Yes, sir; I told him I would accommodate the bank, as they had always accommodated me."

Defendant said, however, he was told who wanted to borrow the money, for what purpose it was desired, and that his note would serve in place of the money he was not able to lend. Understanding the facts, he gave his note. As indicated, the matter of who was in fact accommodated controls. It is not the kindly feeling of the accommodating party which controls. This was expressly held in the case of *Bank v. Watson,* supra. In that case, Blitz had borrowed from the bank all the money it could lend to one person. To help Blitz get more money, which the bank desired to lend, Watson gave his note to the bank. In the opinion it was said:

"The circumstance that the bank was desirous of doing the business, and that the defendant was moved by friendship for the bank rather than for Blitz —by a desire to help the lender to earn interest rather than by a wish to aid the borrower in obtaining a loan—does not affect the legal relationship of the parties." (p. 689.)

The same opinion disposes of the subject of promise by the presi-

dent of the bank that the maker of the note would not have to pay it, and the subject of consideration.

Dillman testified it was understood defendant was not to pay his note. It was to be paid by directors, who were to give defendant their note. The directors did give their note to defendant for the same amount as defendant's note to the bank. Dillman held this note and showed it to defendant, who indicated convenience would be subserved by Dillman holding it. Defendant testified Dillman said they would put up the bank's note with defendant's note, and the bank would pay interest on it, and pay it off. Accepting defendant's version of this part of the conversation, the essential character of the transaction remains the same. Defendant's own testimony established the fact that money was to be borrowed by somebody to pay something, and the bank was not borrowing the money to pay to itself money owed to itself. Defendant was lending his note in place of cash to enable some directors to pay an assessment on stock, and the matter of how and by whom defendant was to be assured he would not be obliged to pay his note had nothing to do with the undisputed purpose to be accomplished by giving his note.

Defendant testified he did not get the note to him which the directors signed, did not know who signed it, and did not know what was done with it. This merely indicated that after he gave his own note to accommodate the directors, he was either careless or trustful about his security.

Dillman was one of the directors who signed the note given to defendant. Dillman was permitted to testify, over proper objection which should have been sustained, that he was talking to defendant as president of the bank and as a member of the board of directors. If, in his own mind, Dillman approached defendant clothed in official panoply, he did not reveal the fact to defendant. He did not tell defendant the bank, or the president of the bank, or the board of directors, wanted to borrow money. He said some of the directors wanted to borrow the money. The question was not who arranged the accommodation, but who was accommodated, and in *Bank v. Watson* it was the president of the bank who procured Watson to give his note to help Blitz borrow more money.

After Dillman had related in detail all he said to defendant, Dillman was permitted, over proper objection which should have

been sustained, to testify that he put the subject of giving a note up to defendant "strictly as a banking proposition and as a representative of the board of directors." Dillman could not, by this colorful characterization, add to or detract from the plain tale he had told.

There is nothing else in the testimony of sufficient importance to require special comment.

The judgment of the district court is reversed, and the cause is remanded with direction to sustain plaintiff's demurrer to defendant's evidence.